UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| LEGACY EQUITY ADVISORS, LLC, a Texas limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>AT&T INC., a Delaware corporation,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§   Civil Action No.: |

**PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Legacy Equity Advisors, LLC ("Legacy" or "Plaintiff"), through its undersigned attorneys, hereby alleges in support of its Complaint against Defendant AT&T Inc. ("AT&T" or "Defendant") as follows:

**INTRODUCTION**

1. Legacy is a prominent, African American-owned private equity company. Its business model is to source deals and bring in co-investors, as appropriate.

2. Defendant AT&T is one of the oldest telecommunications companies in the United States. Historically, AT&T's leadership roles have been dominated by white men.

3. After making multi-billion-dollar acquisitions outside its core telecommunications business (such as DirecTV and Time Warner), AT&T became highly leveraged and burdened by significant debt. When these assets underperformed, AT&T was forced to divest assets.

4. Legacy positioned itself to acquire AT&T's "non-core" assets. Legacy obtained financial commitments from prominent, deep-pocketed investors and assembled management teams featuring seasoned, industry veterans. Legacy assumed that AT&T was interested in

obtaining the best price for its assets and that AT&T would want an open bidding process.

5. For years, Legacy attempted to contract with AT&T to acquire these assets, to no avail. AT&T subjected Legacy to a discriminatory and exclusionary contracting process and ultimately refused to contract with Legacy to sell any of its "non-core" assets.

6. Despite being well qualified, AT&T did not view or treat Legacy as a serious or qualified buyer because of its African American ownership and management.

7. Despite Legacy's reputation and access to substantial financial resources from investors like billionaire Tom Hicks, Bain Capital and Jay-Z's Roc Nation, AT&T imposed racially motivated barriers to contract because Legacy is African American owned and operated.

8. At the same time, AT&T sold assets to similarly situated, less qualified white-owned companies. AT&T gave contracts and preferential contractual terms to white-owned companies that were denied to African American-owned Legacy.

9. Meanwhile, in an attempt to conceal its racial animus, AT&T made assurances that lulled Legacy into believing AT&T would actually sell assets to it. AT&T's assurances were false and misleading, but Legacy did not know it at the time.

10. AT&T's racial bias is the byproduct of entrenched institutionalized corporate racism, and is the modern-day manifestation of the mid-nineteenth century belief that African Americans are inferior to whites. Through this lawsuit, Plaintiff seeks to vindicate its rights under 42 U.S.C. § 1981 ("Section 1981").

11. Section 1981 was enacted as part of the Civil Rights Act of 1866, following the Civil War, to bring the newly freed slaves into the American economy. Still viable and enforced by federal courts, it broadly prohibits racial discrimination in contracting and in the contracting process.

12. Specifically, Section 1981 provides all persons the "same right…to make and enforce contracts…as is enjoyed by white citizens…" 42 U.S.C. § 1981(a).

13. In 1991, Congress expanded Section 1981 to prohibit discrimination in any part of the contracting process, specifically, "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Per Congress, "[t]his list is intended to be illustrative and not exhaustive."

14. This lawsuit involves racial refusals to contract and a racially discriminatory contracting process in violation of Section 1981.

## PARTIES, JURISDICTION, AND VENUE

15. Plaintiff Legacy Equity Advisors, LLC is a Texas limited liability company headquartered in Dallas County, Texas.

16. Defendant AT&T Inc. is a Delaware corporation headquartered in Dallas County, Texas. It may be served with this complaint through its registered agent for service of process, C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201-3136.

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. This Court is the proper venue pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Plaintiff and Defendant reside in this judicial district and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

## FACTUAL ALLEGATIONS

### A. Legacy and Marcellus Taylor

18. Legacy is a private equity firm owned by Marcellus Taylor, an African American man with twenty-five years of experience in private equity.

3

19. Mr. Taylor has had an enduring career in finance. Prior to founding Legacy, Mr. Taylor worked as a managing director of the private equity firm, Erasmus Advisors; as a management consultant for Boston Consulting Group; and as an investment banker in Morgan Stanley's corporate finance department. He earned his Master of Business Administration from Harvard Business School, where he was a Robert Togio Fellow.

20. Throughout the years, Mr. Taylor has earned a reputation for business acumen, negotiation prowess, and a keen intellect. In fact, Mr. Taylor was an instrumental driving force behind Legacy's multiple investments in high-profile, multi-million dollar deals with top-tier private equity firms, including The Carlyle Group, Bain Capital, Hicks Muse and Clayton Dubilier.

21. Given their track record, Mr. Taylor and Legacy were well-positioned, qualified, financed and prepared to participate in buying AT&T's "non-core" assets.

**B.  AT&T Announces Plans to Divest "Non-Core" Assets**

22. In 1984, AT&T was spun off pursuant to an antitrust consent decree, becoming an independent publicly traded telecommunications services provider. Thereafter, AT&T expanded its wireline and wireless operations through mergers and acquisitions to become one of the leading telecommunications services providers in the country.

23. In March 2019, AT&T's Chief Financial Officer, John Stephens, announced plans to divest several "non-core" businesses. AT&T needed to sell these "non-core" assets to pay down debt incurred after spending more than $150 billion in attempts to compete in the entertainment, media and streaming space.

24. The two most significant transactions that led to this divestiture plan were AT&T's purchase of DirecTV and its merger with Time Warner. Both transactions were

proposed and completed under the stewardship of AT&T's former CEO and Chairman, Randall Stephenson.

25.     Mr. Stephenson became CEO in 2007, and in the ensuing eight years, the company's share price barely recovered from the Great Recession as fierce competition in wireless squeezed AT&T's profit margins.  Mr. Stephenson and AT&T's Chief Operating Officer, John Stankey, saw media as a path to growth and profits.

26.     In 2015, AT&T bought DirecTV for $49 billion ($67 billion including debt). After the acquisition, DirecTV lost millions of subscribers.  In 2021, AT&T spun off DirecTV and the rest of its pay TV operations into a new company and reported a $15.5 billion impairment charge.

27.     In 2018, AT&T acquired Time Warner for $85 billion ($109 billion including debt).  This transaction brought Time Warner (renamed Warner Media) and its holdings (CNN, Warner Brothers, DC Comics and HBO) under the same umbrella as AT&T's telecommunications holdings including DirecTV.

28.     The Time Warner transaction was criticized because there were few readily apparent synergies between a telecommunications business and an entertainment company. Afterwards, AT&T reported that Warner Media's revenue declined a billion dollars year-over-year and that earnings dropped 22.8 percent.  The day these results were announced, AT&T reported that AT&T COO John Stankey would replace Mr. Stephenson as CEO.

29.     Ultimately, AT&T spun off Warner Media, like DirecTV, merging Warner Media with Discovery, Inc. to create Warner Bros. Discovery, Inc.

30.     These transactions forced AT&T to raise prices across its businesses and lay off thousands of employees.  It is estimated that the acquisitions of DirecTV and Warner Media

caused AT&T to lose $100 billion.

### C. Legacy Positions Itself as Buyer for AT&T's Divested Assets

31. When Legacy learned that AT&T planned to divest assets, its principal, Mr. Taylor, went out and secured capital commitments from deep-pocketed private equity firms and assembled a team of experienced telecommunications professionals to submit bids.

32. Legacy was interested in acquiring AT&T's pre-paid cellular service provider, Cricket Wireless, which provides pre-paid wireless services to millions of subscribers across the nation.

33. AT&T had acquired Cricket Wireless in 2014 through its $1.2 billion dollar acquisition of Cricket Wireless's parent company, Leap Wireless.

34. On March 25, 2019, Marcellus Taylor met with AT&T CFO John Stephens to submit a bid to acquire a majority stake in Cricket Wireless for $4.6 billion.  Mr. Taylor informed Mr. Stephens that Legacy had arranged financial backing from billionaire Tom Hicks, Bain Capital and Roc Nation.

35. Legacy's investment thesis was to cater to the African American and Hispanic markets.  African Americans and Hispanics represented the bulk of Cricket Wireless's customers, but AT&T's marketing strategy failed to connect with these groups.  The brand was not reaching its potential.

36. Legacy's strategy was to put in place a best-in-class management team backed by deep pockets (Bain Capital and Mr. Hicks), with Jay-Z's Roc Nation as a strategic investor.  Roc Nation's roster includes iconic artists and worldwide celebrities such as Beyoncé, Rhianna and Shakira, who each have over 200 million social media followers, and who, it was contemplated, would assist with marketing.

37. Legacy had the capital, management team and strategy in place to complete the Cricket deal, and its investors were highly motivated to close.

38. Mr. Taylor also told AT&T that it wanted to bid on any and all assets that AT&T planned to divest. In response, AT&T Senior Vice President, Steve McGaw, told Mr. Taylor during a phone call that while he admired Mr. Taylor's ambitions, he had no confidence that an African American firm like Legacy could successfully raise the capital necessary to acquire billion-dollar assets.

39. Mr. Taylor reassured Mr. McGaw that Legacy had extensive financial backing from best-in-class investors; offered to send him term sheets from these investors; and underscored that Legacy was ready, willing and able to acquire the billion-dollar assets AT&T planned to divest.

40. At the time, Mr. Taylor did not appreciate the motive or meaning behind Mr. McGaw's comments, as Mr. Taylor believed that Mr. McGaw's concern was with Legacy's ability to close, and that his reassurances had resolved any such concern.

41. AT&T knew that Legacy had financial resources and backing and that Legacy was interested in bidding on any asset AT&T chose to divest.

42. Approximately one month after Legacy submitted its $4.6 billion bid for Cricket Wireless, Messrs. Stephens and McGaw called Mr. Taylor to inform him that CEO Randall Stephenson had rejected Legacy's bid.

43. Messrs. Stephens and McGaw told Mr. Taylor, however, that AT&T was divesting hundreds of AT&T retail stores across the country and that AT&T would sell Legacy a portfolio of those stores, in successive tranches.

### D. AT&T Does Not Allow Legacy to Bid on DirecTV

44. Legacy learned that AT&T was looking to divest DirecTV. Mr. Taylor told AT&T that Legacy was interested in bidding for DirecTV.

45. Legacy was prepared to make a substantial, multi-billion-dollar bid for a stake in DirecTV. Any reasonable company in AT&T's position would have encouraged Legacy to bid, but AT&T did not.

46. Over a year later, AT&T announced that it had created a new entity to own and operate DirecTV and that it had sold a stake to a white-owned private equity company.

47. Legacy had the resources to make a competitive bid for DirecTV, but AT&T never gave Legacy the opportunity.

### E. Legacy Pivots to a Retail Store Strategy

48. Although Legacy and its investors preferred to focus on billion-dollar assets, Legacy agreed to pursue AT&T's offer to acquire its retail stores. AT&T planned to divest hundreds of stores across the country, but it only gave Legacy an opportunity to bid on 88 stores. This offer was a sham.

49. With financial backing from St. Could Capital LLC and CIC Partners (founded by former Dallas Mayor, Michael Rawlings), Legacy submitted a $31 million bid for the 88 retail stores, and AT&T accepted its bid.

50. While this was a smaller deal, AT&T had assured Legacy that additional stores would be offered, in successive tranches. Legacy wanted, and told AT&T it would move forward with, this acquisition.

51. Based on AT&T's assurances and acceptance of Legacy's bid for the first tranche of 88 stores, Legacy devoted significant resources to pursue this acquisition.

52. Mr. Taylor participated in multiple conference calls with AT&T executive Chris Cass to work towards Legacy's buy-out of the first tranche of 88 stores. Mr. Cass represented AT&T during the due diligence phase of the store acquisition process, and Mr. Taylor understood that Mr. Cass would be the AT&T officer to approve and sign the store purchase and sale agreement.

53. During one call, Mr. Cass told Mr. Taylor that he viewed African American-owned firms as not being able to secure financing. Mr. Taylor replied that was not the case here at all, and reassured Mr. Cass he could and would perform.

54. Mr. Cass also said that given his experience with African American-owned firms, he questioned whether Legacy would be able to close the transaction. Mr. Taylor responded that Legacy had financial backing, told AT&T its sources of capital and assured AT&T that it could and would close.

55. At the time, Mr. Taylor did not fully appreciate the import of Mr. Cass's comments, as AT&T continued to assure Mr. Taylor that it would sell Legacy multiple stores. Mr. Taylor took AT&T at its word and continued to work on the transaction.

56. During due diligence and negotiation for the tranche of 88 stores, AT&T told Legacy that it would be able to hire the store employees—a critical issue as, without that ability, the assets Legacy planned to acquire were basically just store leases.

57. Ultimately, however, AT&T changed course and demanded that Legacy take possession of the 88 stores during the holiday season—the busiest time of the year—without the right to hire store employees.

58. These were unreasonable conditions designed to block Legacy's acquisition of the stores. Without being able to hire the store employees, Legacy would be forced to hire and train

hundreds of new employees to be able to handle the high customer demand of the holidays. AT&T's conditions fundamentally undermined the deal.

59. Based on AT&T's conditions, Legacy could not complete the acquisition.

60. Although frustrated with AT&T, Mr. Taylor continued to believe that AT&T had a good faith intent to sell assets to Legacy.

61. Lulled by AT&T's assurances that it was interested in selling assets to Legacy, Legacy requested that AT&T allocate another tranche of stores that would include employees. Legacy anticipated significant investment profits after purchasing the stores.

62. In fact, in January 2022, Mr. Taylor emailed Mr. Cass, reiterating that Legacy remained interested in purchasing AT&T stores, or other divested assets, and that Legacy had strong access to financial capital from top-tier investors.

63. AT&T did not respond.

64. In March 2022, Mr. Taylor learned for the first time that former AT&T CEO Stephenson's newly created Blue Link Wireless company had acquired the 88 retail stores previously allocated to Legacy. But AT&T did not impose the same conditions on Blue Link Wireless. AT&T allowed Blue Link Wireless to hire store employees and take possession during a less demanding part of the year.

65. Despite Mr. Taylor's qualifications, expertise and financial resources, AT&T sold the 88 stores on more favorable terms to Mr. Stephenson and his white-owned Blue Link Wireless company. AT&T gave its former white CEO a more favorable deal than that offered to African American-owned Legacy.

F. **AT&T Precluded Legacy from the Opportunity to Bid on Other Non-Core Assets**

66. Mr. Taylor learned in January of 2023 that AT&T agreed to sell its Puerto Rico

wireless division for $1.95 billion to John Malone's white-owned Liberty Media Corporation. Mr. Malone was a long-time industry colleague of Mr. Stephenson.

67. AT&T did not even inform Legacy about the Puerto Rico wireless division being for sale, although Legacy expressed a willingness to bid on any of AT&T's divested assets.

68. Like Cricket Wireless and the retail stores, the Puerto Rico wireless division was a non-core asset for AT&T.  AT&T accepted Liberty Media Corporation's $1.95 billion bid for the Puerto Rico wireless division without giving Legacy a chance to bid.

69. The irony is that Legacy co-investor, Tom Hicks, was particularly interested in AT&T Puerto Rico because Mr. Hicks already owned the second largest cable system in Puerto Rico and could provide media to drive subscriber growth for wireless.

70. Legacy also discovered that in addition to the divested assets detailed above—Cricket Wireless, the 88 AT&T retail stores, DirecTV, and the Puerto Rico wireless division—there were at least 10 other divested assets that AT&T shut out Legacy from pursuing.

71. The other assets that AT&T shut Legacy out from bidding for include: (1) a tranche of 100 AT&T retail stores; (2) another tranche of 188 AT&T retail stores; (3) Xandra Advertising; (4) a group of 31 data centers; (5) Playdemic Mobile Gaming; (6) Vrio Operations; (7) AT&T Government Solutions; (8) AT&T St. Louis Real Estate; (9) AT&T Downtown Detroit; and (10) AT&T Miami Beach Site.

72. In total, there were at least 14 non-core divested assets that AT&T wanted to sell and that Legacy could have bid on.  Legacy made clear, and AT&T knew, that Legacy was ready, willing and able to acquire these assets.

73. To secure a competitive bidding price for these assets, any reasonable, non-racist company in AT&T's position would have allowed a firm like Legacy to participate in the

bidding process.  Legacy's money is as good and green as anyone else's.

74. No other Black-owned company submitted a bid for these 14 assets, while at the same time, white-owned companies were allowed to bid and ultimately acquire the assets. AT&T, in effect, blocked Legacy from pursuing these assets, and sold them to white-owned companies that were less qualified and on more favorable terms.

75. Denying eligibility to bid and refusing to contract, on account of race, is quintessential discrimination in violation of Section 1981, and it occurred repeatedly here.  For example:

(a) AT&T Senior Vice President, Steve McGaw, foreclosed Legacy from bidding on DirecTV, Puerto Rico wireless and other assets, stating he had no confidence that an African American firm like Legacy could successfully execute on a billion-dollar buy-out of AT&T's assets.

(b) AT&T officer, Chris Cass, precluded Legacy from bidding on additional AT&T retail stores, asserting that he doubted the ability of African American-owned firms like Legacy to secure adequate financing to close transactions.

(c) At the same time, AT&T was actively soliciting bids from less qualified, financially weaker white-owned firms like former CEO Randall Stephenson's Blue Link Wireless.

76. AT&T's racial bias against Legacy is part of a deep-rooted history of a racist corporate culture.  Such institutionalized racism is so pervasive that high-level AT&T executives have actually used racial epithets, including the "N-word," at business functions; and have been accused of, and have engaged in, racist acts and practices numerous times.

77. Mr. Taylor and Legacy are victims of AT&T's systemic racism.  That AT&T

refused to contract with Legacy, and forced it into an unfair contracting process, violates federal law.

## CAUSE OF ACTION

### (RACIAL DISCRIMINATION IN CONTRACTING, 42 U.S.C. § 1981)

78. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

79. AT&T engaged in intentional racial discrimination in contracting that is prohibited under Section 1981. Section 1981 is broad, covering "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

80. African Americans are a protected class under Section 1981. Legacy is a member of that class because it is an African American-owned company.

81. As alleged herein, Legacy made multiple attempts to contract with AT&T, including its $4.6 billion bid for Cricket Wireless, its $31 million bid for 88 AT&T retail stores, and its request for an opportunity to bid on DirecTV and other assets.

82. But AT&T refused to contract with Legacy, concealing its racial animus with false assurances that it would sell assets to Legacy. Meanwhile, AT&T continued to contract with—and made itself available to contract with—similarly situated, white-owned companies.

83. Racial discrimination is the but-for cause of AT&T's refusal to contract. If Legacy were white owned, AT&T would have allowed Legacy to bid on AT&T's "non-core" assets and Legacy would have acquired one or more of such assets.

84. AT&T also subjected Legacy to a racially discriminatory contracting process. By imposing racially-motivated conditions on Legacy, AT&T created a racially discriminatory contracting process where white-owned companies were able to contract on preferential terms.

85.     AT&T's violations of Section 1981, as alleged herein, caused Plaintiff to suffer substantial losses, including lost profits, which exceed $100 million, subject to proof at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff hereby prays for the following relief:

1.   Monetary damages estimated to exceed $100 million, subject to proof at trial;

2.   Attorneys' fees and costs as permitted by law;

3.   Pre- and post-judgment interest; and

4.   Such other relief the Court deems just and proper.

DATED: May 4, 2023              **EWELL, BROWN, BLANKE & KNIGHT LLP**

    */s/ Gary Ewell*

_____
Gary Ewell
State Bar No. 06752800
David P. Blanke
State Bar No. 02453600
111 Congress Avenue, 28th Floor
Austin, Texas 78701
512.770.4030
877.851.6384 (facsimile)
gewell@ebbklaw.com
dblanke@ebbklaw.com

**MILLER BARONDESS, LLP**

    */s/ Louis R. Miller*

_____
Louis R. Miller (*Pro Hac Vice Filed*)
David W. Schecter (*Pro Hac Vice Filed*)
Kelley T. Tran (*Pro Hac Vice Filed*)
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
310.552.4400
310.552.8400 (facsimile)
smiller@millerbarondess.com
dschecter@millerbarondess.com
ktran@millerbarondess.com

*Attorneys for Plaintiff*
*Legacy Equity Advisors, LLC*

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED: May 4, 2023

**EWELL, BROWN, BLANKE & KNIGHT LLP**

*/s/ Gary Ewell*
_____
Gary Ewell
State Bar No. 06752800
David P. Blanke
State Bar No. 02453600
111 Congress Avenue, 28th Floor
Austin, Texas 78701
512.770.4030
877.851.6384 (facsimile)
gewell@ebbklaw.com
dblanke@ebbklaw.com

**MILLER BARONDESS, LLP**

*/s/ Louis R. Miller*
_____
Louis R. Miller (*Pro Hac Vice Filed*)
David W. Schecter (*Pro Hac Vice Filed*)
Kelley T. Tran (*Pro Hac Vice Filed*)
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
310.552.4400
310.552.8400 (facsimile)
smiller@millerbarondess.com
dschecter@millerbarondess.com
ktran@millerbarondess.com

*Attorneys for Plaintiff
Legacy Equity Advisors, LLC*