IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LEGACY EQUITY ADVISORS, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:23-CV-0979-D |
| VS. | § | |
| | § | |
| AT&T, INC., | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

Plaintiff Legacy Equity Advisors, LLC ("Legacy") sues defendant AT&T, Inc. ("AT&T") under 42 U.S.C. § 1981, alleging that AT&T discriminated against it based on race. AT&T moves to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief can be granted. For the reasons that follow, the court grants the motion in part and denies it in part, and grants Legacy leave to file a first amended complaint.

I

A

Legacy is a private equity firm owned by Marcellus Taylor ("Taylor"), who is African American.[1]  AT&T is a multinational telecommunications service provider. Since March

---

[1] The court recounts the background facts favorably to Legacy as the nonmovant.  In deciding a Rule 12(b)(6) motion to dismiss, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"  *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (addressing Rule 12(b)(6) standard)).

2019, when AT&T announced plans to sell off a number of its "non-core assets," Legacy has sought to position itself as a buyer for those assets.

In March 2019 Taylor met with AT&T Chief Financial Officer John Stephens ("Stephens") to submit a bid to acquire a majority stake in Cricket Wireless for $4.6 billion. Taylor told Stephens that Legacy had arranged financial backing from several deep-pocket investors. At some point after that meeting, Taylor also informed AT&T that Legacy desired to bid on "any and all" assets that AT&T planned to divest. Compl. ¶ 38. In response, AT&T Senior Vice President Steve McGaw ("McGaw") allegedly told Taylor during a telephone call that "while he admired Mr. Taylor's ambitions, he had no confidence that an African American firm like Legacy could successfully raise the capital necessary to acquire billion-dollar assets." *Id.* ¶ 38. Legacy alleges that, "[a]t the time, Mr. Taylor did not appreciate the motive or meaning behind Mr. McGaw's comments, as Mr. Taylor believed that Mr. McGaw's concern was with Legacy's ability to close" its proposed Cricket Wireless deal. *Id.* ¶ 40. Approximately one month after Legacy submitted its bid for Cricket Wireless, Stephens and McGaw informed Taylor that AT&T Chief Executive Officer Randall Stephenson ("Stephenson") had rejected Legacy's bid, but asserted that AT&T would instead sell Legacy a portfolio of AT&T retail stores in successive tranches.

AT&T then sought and accepted a bid from Legacy for a tranche of 88 AT&T retail stores. During the ensuing negotiation process, Taylor participated in multiple telephone calls with AT&T executive Chris Cass ("Cass"), who represented to Taylor that Cass would be the AT&T officer to approve and sign the sale agreement. On one call, Cass told Taylor

that "he viewed African American-owned firms as not being able to secure financing," and said that "given his experience with African American-owned firms, he questioned whether Legacy would be able to close the transaction." *Id.* ¶¶ 53-54.  Legacy alleges that, "[a]t the time, Mr. Taylor did not fully appreciate the import of Mr. Cass's comments, as AT&T continued to assure Mr. Taylor that it would sell Legacy multiple stores," and Taylor "took AT&T at its word." *Id.* ¶ 55.

According to Legacy's complaint, during the negotiation process for these retail stores, AT&T assured Legacy that the final deal would give Legacy the ability to hire store employees.  Ultimately, however, AT&T insisted that the deal require Legacy to take possession of the stores during the holiday season, without the right to hire store employees. These terms "fundamentally undermined the deal" because they would have forced Legacy to hire and train hundreds of new employees on short notice to handle the high customer demand of the holidays.  *Id.* ¶ 58.  Legacy was unable to complete the acquisition of the stores.

Legacy then requested that AT&T allocate to it another tranche of AT&T retail stores, in a deal that would include the right to hire employees.  Taylor also emailed Cass to inform him that Legacy remained interested in purchasing AT&T retail stores or other divested assets.  AT&T did not respond to these communications.

Legacy alleges that it learned for the first time in March 2022 that a white-owned company called Blue Link Wireless, led by then-former AT&T CEO Stephenson, had acquired the 88 retail stores initially allocated to Legacy.  AT&T's deal with Blue Link

Wireless allegedly included "more favorable terms" than the ones to which AT&T had insisted that Legacy agree, including allowing Blue Link Wireless to take possession of the stores during "a less demanding part of the year" and giving it the right to hire store employees. *Id*. ¶¶ 64-65.

Legacy also alleges that AT&T precluded Legacy from bidding on other non-core assets that AT&T divested during this period, including (1) DirecTV, (2) the Puerto Rico Wireless Division, (3) a tranche of 100 retail stores, (4) a tranche of 188 retail stores, (5) Xandr Advertising, (6) a group of 31 data centers, (7) Playdemic Mobile Gaming, (8) Vrio Operations, (9) AT&T Government Solutions, (10) AT&T St. Louis Real Estate, (11) AT&T Downtown Detroit, and (12) AT&T Miami Beach Site.

With regard to DirecTV, Legacy alleges that AT&T announced its intention to divest the company and that Taylor specifically told AT&T that Legacy was interested in bidding. But over one year later, without having given Legacy an opportunity to bid, AT&T announced that it had created a new entity to own and operate the company and that it had sold a stake to a white-owned private equity firm.

Concerning the Puerto Rico Wireless Division, Legacy maintains that it generally "expressed a willingness to bid on any of AT&T's divested assets," but that AT&T did not inform Legacy that the Puerto Rico Wireless Division was for sale. *Id.* ¶ 67. At the same time, Legacy alleges, AT&T accepted a bid from white-owned Liberty Media Corporation, which was run by John Malone, "a long-time industry colleague" of Stephenson. *Id.* ¶¶ 66, 68. Legacy asserts that it would have been particularly well situated to purchase the Puerto

Rico Wireless Division because its investor, Tom Hicks, already owned the second largest cable system in Puerto Rico.

Regarding the other ten non-core assets, Legacy alleges only that AT&T desired to sell the assets; that Legacy "made clear, and AT&T knew, that Legacy was ready, willing, and able to acquire" them; that Legacy was not allowed to participate in any bidding process; and that AT&T ultimately sold them to less-qualified, financially weaker white-owned companies, who had been allowed to bid and ultimately acquire them on "more favorable terms." *Id*. ¶¶ 72, 74.

B

Legacy now sues AT&T under 42 U.S.C. § 1981 for race discrimination in contracting. Legacy alleges in its complaint that, on multiple occasions, AT&T refused to contract with Legacy due to racial animus—including when it rejected Legacy's bid for Cricket Wireless and when it excluded Legacy from bidding on DirecTV, the Puerto Rico Wireless Division, and the ten other non-core assets; and that, on the one occasion that AT&T did enter into contract negotiations with Legacy for the 88 AT&T retail stores, AT&T pushed unfavorable terms on Legacy due to racial animus.

AT&T moves to dismiss this action under Rule 12(b)(6) for failure to state a claim. The court is deciding the motion on the briefs, without oral argument.

II

"In deciding a Rule 12(b)(6) motion to dismiss, the court evaluates the sufficiency of [the plaintiff's] complaint by 'accept[ing] all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"  *Bramlett v. Med. Protective Co. of Fort Wayne, Ind.*, 855 F.Supp.2d 615, 618 (N.D. Tex. 2012) (Fitzwater, C.J.) (second alteration in original) (internal quotation marks omitted) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)).  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]").  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (quoting Rule 8(a)(2)) (alteration omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678.

"Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which

a court may take judicial notice." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (internal quotation marks omitted) (citations omitted). "[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007). Public records include "the contents of public disclosure documents that are filed with the [Securities and Exchange Commission ("SEC")] as required by law." *Firefighters Pension & Relief Fund v. Bulmahn*, 53 F.Supp.3d 882, 901 (E.D. La. 2014).

## III

The court considers first AT&T's contention that Legacy's claims are barred by limitations.

## A

Limitations is an affirmative defense. *See* Rule 8(c)(1). To obtain a Rule 12(b)(6) dismissal based on an affirmative defense, the "successful affirmative defense [must] appear[] clearly on the face of the pleadings." *Sivertson v. Clinton*, 2011 WL 4100958, at *2 (N.D. Tex. Sept. 14, 2011) (Fitzwater, C.J.) (quoting *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986)). In other words, AT&T is not entitled to dismissal under Rule 12(b)(6) based on the statute of limitations unless Legacy has "pleaded [itself] out of court by admitting to all of the elements of the defense." *Cochran v. Astrue*, 2011 WL 5604024, at *1 (N.D. Tex. Nov. 17, 2011) (Fitzwater, C.J.) (quoting *Sivertson*, 2011 WL 4100958, at *3).

Under Texas law, § 1981 claims are subject to a two-year statute of limitations. *Byers*

*v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). "A claim accrues and 'the limitations period begins to run the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured.'" *Spotts v. United States*, 613 F.3d 559, 574 (5th Cir. 2010) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001)); *Nicholson v. A.H.D. Hous., Inc.*, 2022 WL 4543201, at *4 (S.D. Tex. Sept. 28, 2002) ("Accrual of a claim under § 1981 commences when the plaintiff first has actual knowledge of the violation or has knowledge of facts that, in the exercise of due diligence, would have led to actual knowledge.").

A claim, however, can be subject to the doctrine of equitable tolling, which allows the plaintiff to avoid the bar of the statute of limitations when, "despite all due diligence, [it] is unable to discover essential information bearing on the existence of [its] claim." *Pacheco v. Rice*, 966 F.2d 904, 906-07 (5th Cir. 1992); *see also Granger v. Aaron's, Inc.*, 636 F.3d 708, 712 (5th Cir. 2011) (holding that a claim may be equitably tolled due to the plaintiff's "unawareness of the facts giving rise to the claim because of the defendant's intentional concealment of them"). "Equitable tolling applies principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights." *Nakedhead v. Stephens*, 2015 WL 5062508, at *2 (N.D. Tex. Aug. 27, 2015) (Fitzwater, J.) (quoting *Coleman v. Johnson*, 184 F.3d 398, 402 (5th Cir. 1999)).

"Rule 12(b)(6) dismissal under a statute of limitation is proper only when the complaint makes plain that the claim is time-barred and raises no basis for tolling." *Petrobras Am., Inc. v. Samsung Heavy Indus. Co.*, 9 F.4th 247, 253 (5th Cir. 2021).

B

1

Legacy alleges that AT&T refused to contract with it due to racial animus, both (1) when it rejected Legacy's bid for Cricket Wireless and (2) when it excluded Legacy from bidding on DirecTV, the Puerto Rico Wireless Division, and other non-core assets.

Legacy's Cricket Wireless-based claim is time-barred.  According to the complaint, Legacy learned that AT&T had rejected its bid for Cricket Wireless in approximately April 2019.  The statute of limitations immediately began to run, so Legacy's claim expired in approximately April 2021.  Because Legacy has not alleged that AT&T "actively misled" it about the cause of action or that Legacy was "prevented in some extraordinary way from asserting [its] rights," equitable tolling is inapplicable.  *See Nakedhead*, 2015 WL 5062508, at *2.  And because the statute of limitations is two years, the Cricket Wireless basis for Legacy's § 1981 claim must be dismissed as time-barred.

2

Legacy's Puerto Rico Wireless Division-based claim is also time-barred.  Legacy alleges no dates associated with this claim, but AT&T's Form 8-K published in October 2019 establishes that Legacy had sufficient information to know that it had a claim by October 28, 2019.  The claim therefore expired by October 28, 2021.  Because Legacy proffers no evidence that AT&T intentionally concealed facts related to this claim, equitable tolling is inapposite.  This basis for Legacy's § 1981 claim must be dismissed as time-barred.

As for the other exclusion-from-bidding claims, Legacy alleges insufficient facts

about the timing of the events in question for the court to determine that the claims are untimely.  Legacy includes a total of two dates in the portions of the complaint dedicated to these allegations, which may amount to more than one dozen individual claims.  AT&T's Form 10-Qs published on May 6, 2021 and August 5, 2021 indicate that the DirecTV claim and the Playdemic Mobile Gaming claim may be timely, because they provided public notice of AT&T's sale of those assets fewer than two years before this lawsuit was filed on May 4, 2023.  But Legacy does not definitively allege whether it had actual knowledge of the sales before those dates.

Accordingly, the court declines to hold that the other exclusion-from-bidding claims are barred by limitations.

3

Legacy alleges that, on one occasion, AT&T did enter into contract negotiations with Legacy, for the sale of 88 AT&T retail stores, but AT&T imposed unfavorable terms due to racial animus.  As pleaded, this basis for Legacy's § 1981 claim is not time-barred.

Legacy alleges that it first realized that it was injured as to the 88 retail stores in March 2022, when it learned that AT&T had sold the stores to Blue Link Wireless.  AT&T's SEC filings do not clearly address this sale, so the court cannot take judicial notice of any earlier date on which Legacy would have had notice of its claim.  And Legacy plausibly pleads that it neither knew nor should have known that it had a § 1981 claim at the time of Cass's racially discriminatory comments.  Legacy alleges that, at the time, it saw alternative, nondiscriminatory motivations behind Cass's comments and that, on account of AT&T's

continued negotiations with Legacy over the stores, it had no reason to believe that it had been injured.  Accepting these well-pleaded facts as true and construing them in Legacy's favor, the court holds that it is not clear from the face of the pleadings that this basis for Legacy's § 1981 claim is time-barred.

C

In sum, the court grants in part and denies in part AT&T's motion to dismiss based on the statute of limitations.

IV

The court now turns to AT&T's contention that Legacy has failed to plead a plausible *prima facie* case of race discrimination.

A

Section 1981 provides all persons the "same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a).  This right extends to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b); *see Felton v. Polles*, 315 F.3d 470, 480 (5th Cir. 2002).

To prevail on a § 1981 claim, the plaintiff must initially establish a *prima facie* case of intentional discrimination.  *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).  The plaintiff must show that (1) it is a member of a racial minority;[2] (2) the defendant

---

[2]The parties do not dispute that Legacy, an African American-owned firm, satisfies this element of its *prima facie* case of racial discrimination under § 1981.

- 11 -

intended to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute—here, the making of a contract. *See Bellows v. Amoco Oil Co.*, 118 F.3d 268, 274 (5th Cir. 1997); *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.,* 869 F.3d 381, 386 (5th Cir. 2017). "The plaintiff may establish a *prima facie* case by direct evidence or, more commonly, by circumstantial evidence of discriminatory motive." *Bellows*, 118 F.3d at 274.

In determining discriminatory intent, the court "[views] the complaint as a whole," rather than analyzing any one statement or conduct "in isolation." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 289 (5th Cir. 2004). The plaintiff must do more than simply allege that race was one "motivating factor" in the defendant's denial of an opportunity to contract—it must present facts showing that "but for race, it would not have suffered a loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. ___, 140 S.Ct. 1009, 1014, 1019 (2020).

To establish but-for causation by circumstantial evidence, the plaintiff may, *inter alia*, allege that the defendant treated the plaintiff differently from similarly-situated entities that are not part of the protected class. *See Body by Cook*, 869 F.3d at 386. At the motion to dismiss stage, the court does not conduct an in-depth analysis of whether the plaintiff's alleged comparators are actually "similarly situated"; rather, the plaintiff "need only plausibly allege facts going to the ultimate elements of the claim." *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 768 (5th Cir. 2019). But a complaint that "generally alleges that other similarly situated individuals were treated differently," "without more, is merely a legal

conclusion that [the court is] not required to credit." *Rountree v. Dyson*, 892 F.3d 681, 685 (5th Cir. 2018).

A plaintiff can also rely on evidence of a defendant's discriminatory statements. When a plaintiff offers discriminatory statements as direct evidence, the court applies a four-part test. *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012). Under this test, the statements must be: (1) race-related; (2) proximate in time to the challenged action; (3) made by an individual with authority over the challenged action; and (4) related to the challenged action. *Id.*; *Odubela v. Exxon Mobil Corp.*, 736 Fed. Appx. 437, 442 (5th Cir. 2018) (per curiam). But when a plaintiff offers discriminatory remarks as circumstantial evidence, the court applies a "more flexible" two-part test. *Reed*, 701 F.3d at 441; *see Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 475 (5th Cir. 2015). Under this test, the comments must show merely "(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged . . . action or by a person with influence or leverage over the relevant decisionmaker." *Reed*, 701 F.3d at 441.

To satisfy the third element of the *prima facie* case, in this context, the plaintiff must show that the defendant's discrimination concerned the "making" of a contract. *Bellows*, 118 F.3d at 274. The plaintiff need not allege an existing contract, but it must plead facts demonstrating that it made "an actual attempt to contract" that was "actually prevented, and not merely deterred" by the defendant. *Arguello v. Conoco, Inc.*, 330 F.3d 355, 358-59 (5th Cir. 2003) (quoting *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 752 (5th Cir. 2001)).

A plaintiff's allegation that it submitted a bid for a contract and was thereafter

discriminated against by the defendant during contract negotiations is sufficient to satisfy this element, because the bid is a specific offer that constitutes "an actual attempt to contract" and kicks off the contract-making process. *See id.* at 359 n.6 (specific offer to purchase constitutes "actual attempt to contract"); *In re Texxon Petrochemicals, L.L.C.*, 67 F.4th 259, 263 (5th Cir. 2023) (reciting elements of an offer).

On the other hand, a plaintiff's allegation that it expressed a desire to bid but was prevented from bidding due to the defendant's discrimination only satisfies this element under certain circumstances. The Fifth Circuit has held that "the 'making' of a contract must include the opportunity to enter into negotiations on equal terms"—meaning that, in general, alleging discrimination in the provision of bidding opportunity should suffice. *Arguello*, 330 F.3d at 360. But the Supreme Court has clarified that only certain types of bidding processes are actually governed by § 1981. Where an entity has "extended a *public* offer" to submit contract proposals that is "open, on its face, to any [party] meeting certain minimum requirements," § 1981 applies, and the entity cannot discriminate concerning whom it allows to bid. *Runyon v. McCrary*, 427 U.S. 160, 188 (1976) (emphasis added); *see also Perkins v. New Orleans Athletic Club*, 429 F. Supp. 661, 665 (E.D. La. 1976). But where an entity conducts a *private* call for contract proposals, "on the basis of personal invitations extended to a limited number of preidentified" individuals, § 1981 does not apply, and the entity need not give all interested individuals the opportunity to bid. *Runyon*, 427 U.S. at 188; *Perkins*, 429 F. Supp. at 664-65. This is because, "[i]n certain personal contractual relationships . . . such as those where the offeror selects those with whom he desires to bargain on an

- 14 -

individualized basis . . . there is reason to assume that, although the choice made by the offeror is selective, it reflects 'a purpose of exclusiveness' other than the desire to bar members of" certain races, and "[s]uch a purpose, certainly in most cases, would invoke associational rights long respected." *Runyon*, 427 U.S. at 187-88.  Thus a plaintiff who pleads facts indicating that it expressed to the defendant its desire to bid on a contract, but the defendant did not allow it to bid, will only satisfy this third element of its *prima facie* case if any bidding process hosted by the defendant was open to the public.

B

Even if Legacy's exclusion-from-bidding claims are not time-barred, they must be dismissed, because Legacy has failed to plausibly plead a *prima facie* case of race discrimination under § 1981.

Legacy alleges insufficient facts for the court to draw the reasonable inference  that AT&T intended to discriminate based on race when it excluded Legacy from any bidding process for these assets.  Legacy pleads that AT&T "foreclosed Legacy from bidding on DirecTV, Puerto Rico Wireless, and other assets" while "actively soliciting bids from less qualified, financially weaker white-owned firms." Compl. ¶ 75.  But the complaint does not allege, for example, that these firms were similarly situated to Legacy, nor does the complaint plead any facts that would enable the court to draw the reasonable inference that the firms were similarly situated to Legacy.  The complaint's allegation that AT&T sold these assets to white-owned firms on "more favorable terms" does not remedy this pleading defect.  *Id.* ¶ 74.  Absent an allegation that terms of sale for these assets were ever discussed

with Legacy, there are no terms to compare with deals involving AT&T and white-owned firms. Moreover, the complaint does not allege that AT&T executives made racially discriminatory remarks in the context of the potential contracting process for these assets, nor does it plead any other facts that would enable the court to draw circumstantially the reasonable inference of discrimination.

And the complaint fails to allege facts that are sufficient to satisfy the third element of a *prima facie* case. Legacy alleges that it expressed a specific interest to AT&T in bidding for DirecTV and in purchasing AT&T retail stores, as well as a general "willingness to bid on any of AT&T's divested assets." *Id.* ¶ 67. But the complaint does not plead facts that would enable the court to reasonably infer that AT&T held a public (or any) bidding process for any of these assets. Thus under *Runyon* the fact that Legacy was excluded from bidding does not confer a claim under § 1981. *See Runyon*, 427 U.S. at 188.

C

Legacy alleges that Blue Link Wireless, a white-owned company, acquired 88 AT&T retail stores originally allocated to Legacy. Because Legacy alleges facts that allow the court to draw a reasonable inference of intentional race discrimination, the court declines to dismiss this claim.

The court sets to one side as insufficient Legacy's allegations of differential treatment between Legacy and Blue Link Wireless. Legacy pleads generally at the beginning and end of the complaint that AT&T sold assets to "similarly situated, less qualified white-owned companies," Compl. ¶¶ 8, 82, that it did not sell to Legacy. It is difficult to draw the

reasonable inference that Legacy intends for this allegation to apply to this particular claim, because Legacy nowhere specifically alleges that Blue Link Wireless was similarly situated to Legacy.  Legacy also fails to allege any specific facts concerning how Blue Link Wireless might have been similarly situated to Legacy.

But Legacy's allegation of discriminatory remarks by AT&T executive Cass does enable the court to draw the reasonable inference that Legacy has a plausible claim.  Legacy alleges that, during the negotiation process, Cass told Taylor that "he viewed African American-owned firms as not being able to secure financing," and he said that "given his experience with African American-owned firms, he questioned whether Legacy would be able to close the transaction."  *Id*. ¶¶ 53-54.  This allegation meets *Reed*'s requirements for direct evidence of discrimination, because it recounts comments that were race-related, uttered in the midst of an allegedly discriminatory negotiation process, made by an AT&T executive with authority to negotiate and approve the deal, and related to the specific deal at hand.  *See Reed*, 701 F.3d at 441.

Legacy also satisfies the third element of its *prima facie* case.  According to the complaint, Legacy actually submitted a bid to AT&T, and Legacy and AT&T thereafter entered into contract negotiations, which places the dispute as to AT&T's alleged discrimination squarely in the midst of the contract-making process.

D

In sum, the court grants in part and denies in part AT&T's motion to dismiss based on AT&T's contention that Legacy has failed to plead a plausible *prima facie* case of race

discrimination.

V

The court grants Legacy's request for leave to amend and grants it leave to file a first amended complaint.

> In view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.

*In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 567-68 (N.D. Tex. 2005) (Fitzwater, J.) (quoting *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)).  Accordingly, although AT&T is entitled to dismissal of most of Legacy's claims, the court grants Legacy's request for leave to amend.

*   *   *

The court grants in part and denies in part AT&T's motion to dismiss and grants Legacy leave to file a first amended complaint within 28 days of the date this memorandum opinion and order is filed.

**SO ORDERED**.

September 15, 2023.

_____
SIDNEY A. FITZWATER
SENIOR JUDGE

- 18 -